**Marcus A. JONES, Appellant**

v.

**UNITED STATES, Appellee.**

No. 06–CF–242.

District of Columbia Court of Appeals.

Argued March 11, 2008.

Decided April 18, 2008.

317 A.2d 530 (D.C.1974) (en banc), after the judge had charged the jury before deliberations on the "attitude and conduct of jurors" in words balanced one-sidedly toward the desirability of a verdict. Although, for reasons to be stated, the predeliberation charge given in this case was error, appellant did not object to the giving of the instruction, nor did he adequately preserve objection to the judge's decision to give the *Winters* charge later when the jury deadlocked. Applying plain error analysis, as we must, see *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), we affirm his conviction.

Andrea Roth, Public Defender Service, with whom James Klein, Samia Fam, and Sandra Levick, Public Defender Service, were on the brief, for appellant.

Florence Pan, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III and Deborah Sines, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and THOMPSON, Associate Judges, and TERRY, Senior Judge.

FARRELL, Associate Judge:

A jury found appellant guilty of second-degree murder while armed, a lesser-included offense of the charged crime of armed first-degree murder. Evidence permitted the jury to find beyond a reasonable doubt that Jones had shot Kevin Jackson to death on December 2, 1997.

Jones's principal argument on appeal is that the trial judge erred in giving the model anti-deadlock instruction adopted by the court in *Winters v. United States,*

## I.

Responding to a radio run for gunshots, Officer Dyson of the Metropolitan Police Department (MPD) found Kevin Jackson lying dead on the steps of an apartment building on 18th Place, Northeast. He had been shot four times in the back of the head, the back, and an armpit. Ronnie Tucker, the government's main witness, had known Jackson and appellant (hereafter Jones) from growing up in the area. According to Tucker, he and Jones were dealing drugs in the neighborhood at the time and both were getting their drugs from Jackson. Jones "didn't feel too good" about the fact that he owed Jackson a thousand dollars for drugs, particularly since Jackson had not repaid a debt to him. In 1995, police had searched Jones's house looking for drugs belonging to Jackson, and had seized Jones's drugs along with Jackson's, after which Jackson agreed to repay Jones in drugs for his loss.

Tucker recounted that on the evening of December 2, 1997, he, Jones, and Jackson, all of whom had been drinking, met on M Street and went to get something to eat and "blunts" to use to smoke marijuana.

Jones initially had his Mac 11 gun in his waistband, then stowed it in a closet in the hallway of the apartment building where the men had gathered just outside. In the course of their socializing (and drinking and smoking), Jackson said that to "be around for his son" he was "get[ting] out of the lifestyle" of selling drugs, and told Jones and Tucker that he would "take care" of them by giving them crack cocaine so they could "get on [their] feet." He also told Jones not to worry about the money he owed Jackson. Later, when Jackson was ready to leave, Jones told him to wait so he could walk with him. Jones first went inside, apparently to retrieve his gun, and shortly thereafter Tucker heard four or five shots that sounded "[l]ike a machine gun" coming from the hallway. Though Tucker did not see the shooting, he saw Jackson lying on the ground and Jones standing in the hallway "looking crazy." Jones put the gun in his waistband, shook his head, stepped over Jackson and walked away. As Tucker rode away from the scene in the company of another person, Jones called him on his cell phone and asked, "[I]s he dead?"

Seven years later, in December 2004, Jones was arrested in South Carolina for killing Jackson after Tucker reported the shooting as part of a cooperation agreement with the government stemming from his arrest on federal drug conspiracy charges. When Detective Richmond of the MPD met with Jones in South Carolina and introduced himself, Jones replied that "this has something to do with them young'uns from around M street. I have not been around there for years." In a formal interview with Detective Richmond, after being told why he had been arrested, Jones said, "I know Tuck is snitching on me." In a later taped telephone conversation between Jones and his brother, Jones again said that it was "Ronnie [Tucker] ... who tried to do that to me." Ballistics

evidence confirmed that two of the bullets from Jackson's body were fired from the same weapon and that all four recovered bullets could have been fired from a Mac 11.

A defense witness, Larry Gooch, testified that Tucker had confessed to the shooting of Jackson, and a second defense witness, Joseph Blackson III, testified that Jones had not been in the immediate area of the shooting as of an hour before it took place. A government witness, Akida Manley, also had not seen Jones outside the apartment an hour to an hour and a half before the shooting.

At the conclusion of the final charge to the jury, the trial judge admonished the jurors—without objection, but in an instruction forming a principal basis of this appeal—that "[i]t is not appropriate for a juror, upon entering the jury room, to voice a strong expression of an opinion on the case, or to announce a determination to stand for a certain verdict"; that indeed "[t]he final test of the quality of your service will lie in the verdicts that you return to this courtroom; not in the opinions that any of you may hold before agreement on a verdict"; that "you will make a definite contribution to efficient judicial administration if you arrive at a just and proper verdict"; and that "in your deliberations in the jury room, your purpose should not be to support your own opinion, but rather to ascertain and declare the truth."

After deliberating for about an hour the first day, the jury continued deliberating the next day until 4:35 p.m. when it sent out a note asking, "What shall we do if we can not come to a unanimous decision?" The record does not show whether the judge replied to the note. On the third day, at 12:20 p.m., the jury sent a note stating that it could not reach a unanimous

verdict. Defense counsel moved for a mistrial, a request the judge denied. When the prosecutor then requested an anti-deadlock instruction, the judge asked if there was any reason not to give the charge adopted by the court in *Winters, supra,* and defense counsel first answered "no," then requested instead the "Gallagher" instruction fashioned by the concurring judge in the *Winters* case.[1] Denying that request, the judge "Winterized" the jury shortly before a lunch break, and the jury resumed deliberations after lunch. At 4:45 p.m. it returned a guilty verdict on the lesser-included offense of second-degree murder.

## II.

Without objection, the trial judge concluded his general charge to the jury with an instruction concerning the "attitude and conduct of jurors," which stated as follows:

The attitude and conduct of jurors at the outset of their deliberations are matters of considerable importance. It is not appropriate for a juror, upon entering the jury room, to voice a strong expression of an opinion on the case, or to announce a determination to stand for a certain verdict. When one does that at the outset, a sense of pride may cause that juror to hesitate to back away from an announced position, if and when it is shown that it is wrong.

Remember that you are not partisans or advocates in this matter, but are judges. The final test of the quality of your service will lie in the verdicts that you

return to this courtroom; not in the opinions that any of you may hold before agreement on a verdict.

Bear in mind that you will make a definite contribution to efficient judicial administration if you arrive at a just and proper verdict in this case.

To that end, the court reminds you that in your deliberations in the jury room, your purpose should not be to support your own opinion, but rather to ascertain and to declare the truth.

In conclusion, the verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree with that verdict. Your verdict must be unanimous.

Portions of this instruction are unobjectionable. Cautioning jurors against "announc[ing] a determination to stand for a certain verdict" as soon as they enter the jury room is consistent with the generally recognized duty of jurors "to consult with one another" and to "consider[ ] ... the evidence [impartially] with ... fellow jurors" toward the goal of (or "with a view to") "reaching an agreement."[2] Also, Jones finds no fault with the reminder to the jurors that "you are not partisans or advocates ... but ... judges" whose purpose should be "to ascertain and to declare the truth"—though, more accurately, in a criminal case that purpose is to ascertain whether the prosecution has proven guilt beyond a reasonable doubt, not to declare "the truth" in some ultimate sense.[3]

---

1.  See *Winters,* 317 A.2d at 539 (Gallagher, J., concurring).

2.  See ABA Project on Minimum Standards for Criminal Justice, Trial by Jury, Commentary, § 5.4(a) (1968) (approving Instruction 8.11 of Jury Instructions and Forms for Federal Criminal Cases, 27 F.R.D. 39, 97–98 (1961)). In *Winters, supra,* we recognized that "[u]se of a ... charge such as the one contained in

the ABA standards may be deemed appropriate, either in the original charge or after deadlock becomes apparent." 317 A.2d at 534 (footnote omitted).

3.  See, e.g., *United States v. Glover,* 511 F.3d 340, 347 (2d Cir.2008) ("Mindful that instructions telling juries to 'find the truth' require considerable explication to ensure a jury's understanding of the rule of constitutional

Still, Jones argues, and we agree, that the instruction given has serious defects of commission and omission. First, in the course of stressing the distinction between "opinions" jurors may hold and the verdict they reach, it conveys an evident bias favoring the latter by telling them not only that they will make "a definite contribution to efficient judicial administration if you arrive at a just and proper verdict," but that the *"final test* of the quality of your service will lie in the verdicts you return," rather than "in the opinions ... you may hold before agreement on a verdict" (emphasis added). The message carried by this language has been sharply criticized by the Maryland Court of Appeals. In *Thompson v. State,* 371 Md. 473, 810 A.2d 435 (2002), the court dealt with a predeliberation charge identical in relevant respects to the one given here, including the language:

> Remember that you are not partisans or advocates but rather jurors. The final test of the quality of your service will lie in the verdict which you return to the Court, not in the opinions any of you may hold as you retire.
>
> Have in mind that you will make a definite contribution to efficient judicial administration if you arrive at a just and proper verdict in this case. To this end, the Court reminds you that in your deliberations in the jury room there can be no triumph except in the ascertainment and declaration of the truth.

*Id.* at 439. The court found the instruction to be reversible error (it had been objected to), explaining:

> This concept of a "final test" implies that there is a standard of service to which a juror should aspire, one that requires a verdict to be reached rather than one

that requires consideration of individual conviction and whether individual conviction thoughtfully can be reconciled with collective judgment. Because a verdict cannot be reached without unanimity, the "final test" language logically implies that a "good" juror acquiesces in a verdict rather than adheres to his or her own judgment.... Such language is suggestive of the primacy of collective judgment over individual principle and honest conviction.

*Id.* at 443–44.

This criticism, by a unanimous court, is well taken. Jurors should not be told impliedly that they fail the "test" of responsible service if they do not overcome their "opinions" and reach agreement on a verdict. Equally problematical in our case, moreover, is what the instruction did not include, which was language balanced against the desirability of agreement that reminded the jurors not to surrender their honestly held convictions, even if that prevented agreement. *See* ABA Project, *supra* note 2, Instruction 8.11 ("[D]o not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors"); *Winters,* 317 A.2d at 534 (model instruction) ("[I]t is your duty to decide the case, if you can conscientiously do so"). Broad references to "a just and proper verdict" that must represent "the considered judgment of each juror," which the judge included here, do not provide that balance. In short, a predeliberation charge weighted as one-sidedly as was this one toward the goal of agreement on a verdict should not be given, and it was error to give it here.

sufficiency, a number of courts have discouraged their use."); *Butler v. United States,* 646

A.2d 331, 338 (D.C.1994).

## III.

■ Jones, however, must show that the predeliberation charge was plain error, because he did not object to it. *Olano, supra.* Under that standard, the reviewing court has discretion to correct an error only if the appellant demonstrates that (1) there was error, (2) the error was "plain," clear, or obvious, (3) it affected his "substantial rights," and (4) it resulted in a miscarriage of justice or seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Id.,* 507 U.S. at 725, 732, 736, 113 S.Ct. 1770.

In arguing that the judge should have recognized the flaws in the instruction without objection, Jones reasons as follows: In *Winters,* this court adopted as the "highwater mark" of an anti-deadlock charge a model instruction that, because it carries "sting" in favor of a verdict, may not be given "during the general charge." *Winters,* 317 A.2d at 533, 534. But the predeliberation charge here was weighted in favor of a verdict at least as forcefully— and coercively—as the model *Winters* charge. Thus, Jones argues, it should have been "plain" to the judge that the predeliberation charge he gave overstepped *Winters'* bar against instructing in that fashion during the general charge.

It is a debatable point whether the "attitude and conduct of jurors" instruction the judge gave has the same coercive potential—or should have been seen, *sua sponte,* to have the same potential to force a verdict—as the model *Winters* charge.[4] We have pointed to the failure of the judge's instruction to state anything offsetting its evident bias in favor of a verdict. On the other hand, the instruction does not contain the detailed exhortation in the *Winters* charge about how no "future jury" will be better situated to decide the case, or the specific direction to "jurors for acquittal" and "jurors for conviction" that troubled Judge Gallagher, concurring in *Winters,* and prompted him to suggest an alternative charge we have since held may fairly be substituted for the majority *Winters* instruction. *See* 317 A.2d at 539; *Davis v. United States,* 700 A.2d 229, 231 (D.C.1997). More importantly, the coer-

---

4. The *Winters* charge, as fashioned by the court in that case, provides:

> In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of your fellows, yet *you should examine the questions* submitted to you with candor and with proper regard and deference to the opinions of each other. You should consider that it is desirable that the case be decided; that you are selected in the same manner, and from the same source, from which any future jury must be; and there is no reason to suppose that the case will ever be submitted to twelve persons more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence will be produced on one side or the other. And with this view, it is your duty to decide the case, if you can conscientiously do so. You should listen to each other's arguments

> with a disposition to be convinced. Thus, where there is disagreement, jurors for acquittal should consider whether their doubt is a reasonable one which makes no impression upon the minds of others, equally honest, equally intelligent with themselves, and who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath. And on the other hand, jurors for conviction ought seriously to ask themselves whether they might not reasonably doubt the correctness of a judgment which is not concurred in by others with whom they are associated; and distrust the weight or sufficiency of that *evidence which fails to carry conviction in* the minds of their fellows.

> *Winters,* 317 A.2d at 534; *see* Criminal Jury Instructions for the District of Columbia, No. 2.91 (Alternative B) (4th ed. 1993) (reproducing, with only editorial changes, the *Winters* majority instruction).

cive potential in the *Winters* charge derives heavily from the setting in which it is given, *i.e.,* to "a genuinely 'hung jury.'" *Epperson v. United States,* 495 A.2d 1170, 1176 (D.C.1985) (*Epperson II*). By contrast, when *Winters* enjoined giving its instruction during the general charge, it did so not from concern that jurors might already be "hung," but seemingly with the opposite concern in mind: "*[p]remature* use, during the general charge, may lead to confusion and *create* disagreement ... simply because the judge indicated he expected disagreement." *Winters,* 317 A.2d at 533 (emphasis added). Part of the vice, in other words, in the judge's premature delivery of an instruction stressing the desirability of a verdict is the absence of any indication, "in a predeliberation setting," that the jury would "have a difficult time in their deliberations in the first place." *People v. Goldsmith,* 94 Mich.App. 155, 288 N.W.2d 372, 373 (1979).

So it is questionable whether the trial judge, without objection by counsel, should have recognized a bar imposed by *Winters* to the predeliberation charge he gave. Even assuming Jones has met that part of the *Olano* test, however, he has not overcome the remaining hurdles of the plain error standard. First, he has not shown a "reasonable probability that, but for [the unobjected to instruction], the result of the proceeding would have been different." *United States v. Dominguez Benitez,* 542 U.S. 74, 82, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (citations and internal quotation marks omitted) (stating test for whether error affected "substantial rights"). Despite an instruction tilted toward the desirability of a verdict, the jury here deliberated for some nine hours before signaling

that it could not reach agreement.[5] Jones argues that not much significance should be given to this fact, because if only a single juror was swayed by the instruction favoring agreement over dissent, his right "to a jury in disagreement" was impaired. *Epperson II,* 495 A.2d at 1174. At most, however, Jones can demonstrate a "reasonable possibility," not a "reasonable probability," *Strickler v. Greene,* 527 U.S. 263, 291, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (italics deleted), that the predeliberation charge dislodged even one juror from an honestly held "opinion" favoring acquittal. Moreover, the instruction the judge gave is not without pedigree. Though it does not appear in the standard Redbook instructions for criminal cases,[6] it has been a staple in civil cases for many years in this jurisdiction, *see* Standardized Civil Jury Instructions for the District of Columbia, No. 1.05 (2005) ("Attitude and Conduct of Jurors"), and experience tells us that, in some variant or another, it has played a not uncommon role in Superior Court criminal trials, without objection. *See, e.g., Payne v. United States,* 932 A.2d 1095, 1105 (D.C.2007) ("value of your service" instruction given jury after deliberations had begun). Although we expect that, without substantial modification, the instruction we review here will not be given in the general charge, we cannot say that its presence has "seriously affect[ed] the fairness, integrity or public reputation of [those many] judicial proceedings," *Olano,* 507 U.S. at 736, 113 S.Ct. 1770, including these, in which it has been given.

## IV.

Jones further contends that the predeliberation charge formed a critical part of

---

**5.** As pointed out earlier, it did so first after a full day of deliberations (asking late in the day what it should do "if we cannot come to a unanimous decision", and then after three more hours of deliberation the next morning).

**6.** See note 4, *supra.*

the "surrounding circumstances," *Coleman v. United States,* 515 A.2d 439, 453 (D.C. 1986), that made it error for the judge to give the *Winters* instruction when the jury announced that it was deadlocked. Specifically, he argues that when the judge gave the *Winters* charge instead of the milder "Gallagher" charge his counsel had requested, this reinforced the coercive elements in the predeliberation instruction already given. Jones thus analogizes giving the *Winters* charge here to the procedure forbidden by the court in *Epperson II, supra,* of giving successive anti-deadlock charges to a hung jury, a practice that makes the *Winters* charge "a lecture sounding in reproof" to jurors who have "acted contrary to the earlier instruction." *Epperson II,* 495 A.2d at 1174 (citation omitted).

Jones, however, did not preserve this specific objection either, and once more has not shown plain error. When the jury reported itself deadlocked, Jones asked for a mistrial, which the judge denied. In his opening brief to us, he argued that a mistrial was the only proper remedy at that point. See Brief for Appellant at 32 ("Because the jury had already been given a highly coercive pre-deliberation anti-deadlock charge before it submitted a hung note, the Court should have granted a mistrial rather than giving the jury a second anti-deadlock charge."). But, in his reply brief and at oral argument, Jones effectively conceded that a mistrial was not necessary, and we agree: nothing about the progress of the jury's deliberations to that point suggests that an instruction to continue deliberating would have been out of bounds. Jones's argument, nonetheless, is that when the judge proposed giving the *Winters* charge and Jones's counsel, after momentary acquiescence, instead asked for the "Gallagher" instruction, (a) the judge erred in giving the *Winters* charge and (b) Jones's request sufficed to pre-

serve the objection to it. We disagree with the latter point.

Other than to say, "for the record, we request Gallagher," Jones's counsel gave no reason why he objected to the *Winters* charge. More to the point, he said not a word to the judge about the unique circumstance now highlighted on appeal as to why the charge would have tended to coerce a verdict—*i.e.,* its superimposition upon a predeliberation charge tilted in favor of a verdict. Thus, as the government points out (Brief for Appellee at 15), "from [the judge's] perspective, he gave the *Winters* charge under the precise circumstances for which [it] has been approved by this Court. If [Jones] believed that unusual circumstances rendered the *Winters* charge unacceptable, he was obligated to inform the trial judge of his objection." In *Green v. United States,* 718 A.2d 1042 (D.C.1998), the court dealt with an analogous situation where defense counsel had requested his own instruction (on the law of conspiracy), then "simply object[ed]" without "stat[ing] any particular reason" when the judge instead gave a different instruction. *Id.* at 1055, 1056. In holding that plain error analysis applied, we pointed to Super. Ct.Crim. R. 30's requirement that a party challenging an instruction "stat[e] *distinctly* the matter to which that party objects *and the grounds* of the objection," *id.* at 1056 (emphasis by *Green*) (quoting Rule 30), and explained:

[Appellant's] general objection was neither distinct nor specific enough to preserve this issue for appeal. Rule 30 requires a distinct statement of what was wrong with the instruction and a precise explanation of the grounds for the objection. The purpose of Rule 30 is "to give the trial court the opportunity to correct errors [in] and omissions" from the charge to the jury, a purpose that is ill-served by a party's unex-

plained insistence on its own proffered instruction. As the U.S. Court of Appeals for this jurisdiction has held, under the federal version of Criminal Rule 30, "mere objection to instructions without specification of the ground of the objection does not fulfill Rule 30's purpose and is insufficient to satisfy the rule's requirements."

*Id.* at 1056–57 (citations omitted); *see also Wheeler v. United States,* 930 A.2d 232, 241 (D.C.2007). Here, at least, where the ground at the heart of Jones's claim of coercion is an instruction given without objection two days earlier as part of the general charge, it was incumbent on him to offer that reason why the *Winters* charge would be an unacceptable departure from the practice sanctioned for attempting to overcome jury impasse.

Applying plain error analysis, therefore, we cannot conclude that the *Winters* charge, in its operation here, created an impermissible risk of jury coercion. As we have seen, Jones analogizes this case to *Epperson II* and its bar to successive anti-deadlock charges administered to a hung jury. But, as Jones concedes, there is a notable difference between the situation *Epperson* addressed and this one. *Winters* recognized that it is speculative to assume jurors are in disagreement (incipiently) before deliberations even start— that, indeed, is why the court forbade "premature[ly]" giving its model instruction as part of the general charge. *Winters,* 317 A.2d at 533. *Epperson,* in contrast, concerned a "genuinely 'hung jury'" and, "[b]arring exceptional circumstances," forbade repeating an anti-deadlock charge to jurors who *"once again* report[ ] themselves at impasse" after a first report of deadlock and despite once having been instructed in the anti-deadlock manner. *Epperson II,* 495 A.2d at 1174, 1176 (emphasis added). In the case before us, the unique pressures of the *Epperson* setting

were not present, for the "element [of coercion] . . . already present from [juror] . . . disagreement," *Winters,* 317 A.2d at 532, was absent when the predeliberation charge was given. In that context, we cannot conclude that the differences in language between the "Gallagher" charge Jones asked for and the *Winters* charge given—a charge that "preserve[s] juror independence," *id.* at 533, while yet "emphasi[zing] . . . the desirability of . . . a unanimous verdict," *Benlamine v. United States,* 692 A.2d 1359, 1364 (D.C.1997)— are significant enough to create the "reasonable probability" Jones must show of a different outcome had the judge instructed using the milder anti-deadlock charge. *See Dominguez Benitez, supra.*

Indeed, much the same analysis explains why any error in giving the *Winters* charge was not "clear" or "obvious" to begin with. *Olano,* 507 U.S. at 734, 113 S.Ct. 1770. We have never been asked to apply the *Epperson* rule to the materially different situation of a *Winters* charge given in the wake of a predeliberation charge of the kind given here, and it cannot be said to have been obvious to the trial judge how we would decide the issue. Nor should the other limited situations in which we have reversed for giving the *Winters* charge have alerted the judge to error here. *See, e.g., Benlamine, supra* (*Winters* given despite the trial court's knowledge of jury numerical split); *Smith v. United States,* 542 A.2d 823 (D.C.1988) (same); *Morton v. United States,* 415 A.2d 800 (D.C.1980) (juror had asked to be excused after brother died; judge continued deliberations and gave *Winters* charge).

The remaining circumstances Jones points to also do not convince us that the *Winters* charge constituted plain error. He argues that the instruction may have caused the jury to compromise on a verdict

of second degree murder (on which the jury was instructed as a lesser included offense of the charged premeditated murder), citing cases that have held apparent compromise to be a sign of coercion stemming from an anti-deadlock charge. Jones is correct that his main defense was failure of proof of identity—that Tucker had lied in accusing him of shooting Jackson—rather than a lack of proof of premeditation or deliberation. Yet Jones's counsel argued the lack of premeditation in moving for a judgment of acquittal and did not object when the prosecutor sought the lesser included offense instruction for that reason. And, even crediting Tucker's testimony, the jury could reasonably have been troubled by the vagueness of the evidence of why, or with what forethought, Jones had shot Jackson when moments before they had been socializing together. Compromise may indeed have played a role in the verdict returned—as it not infrequently does, and legitimately so, *see Standefer v. United States*, 447 U.S. 10, 22, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980)—but the supposition that the lesser verdict here was driven by the *Winters* instruction rather than disagreement over whether Jones manifested the culpability needed to convict him of the most serious charge is too weak to support a finding of plain error.[7]

The *Winters* instruction, to repeat, is "the highwater mark for an anti-deadlock charge" in this jurisdiction, but we have not held its use to be unduly coercive without additional circumstances that seriously enhance the risk of coercion already "present from a [jury's] desire for a decision and disagreement as to it." *Winters*, 317 A.2d at 532. Although we have criticized the predeliberation instruction given in this case, neither by itself—unobjected to—nor combined with the other circumstances Jones cites did it magnify the risk of coercion from the *Winters* charge so as to "seriously affect[ ] the fairness, integrity or public reputation of [the] proceedings." *Olano*, 507 U.S. at 736, 113 S.Ct. 1770 (citation omitted).

## V.

■ Finally, and separately, we reject Jones's argument that it was plain error (once more, no objection having been made) for the trial judge to allow the prosecutor to question a defense witness, Joseph Blackson III, about arrests or convictions of his family members for unrelated matters in an attempt to show his bias against the government. The judge permitted the questioning based on a proffer by government counsel that all of these persons had been prosecuted by the Office of the United States Attorney for the District of Columbia, and that—combined with related searches of Blackson's and his brother's jail cells—this gave him strong reason to think the prosecutor's "office has something against him."

---

7. Also insufficient as proof of coercion is the fact that the jury, at the end of the first full day of deliberations, inquired "what shall we do if we cannot come to a unanimous decision?," then was released for the night without an apparent answer by the judge. This first indication of jury disagreement did not require the judge to do anything more than ask the jurors to resume deliberations (after a night's rest), as he implicitly did; and they continued to deliberate for three hours the next morning before declaring themselves deadlocked. Nor does the fact that the government's case depended almost solely on the testimony of Tucker, a convicted drug conspirator, make it probable the *Winters* charge induced a guilty verdict. Tucker's credibility may well have been the sticking point for jurors reluctant to convict, but it does not persuade us that when they overcame that reluctance they did so despite—rather than in keeping with—*Winters'* admonition to do so only if they "[could] conscientiously do so."

Jones relies on the principle that it is not "plausible to assume categorically that a witness awaiting criminal trial on charges unrelated to the present case is fired by government hostility," and that such an assumption is "too attenuated a theory of relevance, without additional circumstances, to justify a large-scale breach in the rule barring proof of arrests or criminal charges." *Williams v. United States,* 642 A.2d 1317, 1322 (D.C.1994). The government replies that the bias cross-examination here was not based on a "categorical" assumption, but particularized by a good faith belief that Blackson held the same office that was prosecuting Jones responsible for unfairly "go[ing] after [Blackson's] mother and his sister and anyone related to him" (Br. for Appellee at 40, quoting prosecutor's proffer), as well as for unjustifiably searching his jail cell.

Whether this basis provided the "additional circumstances" justifying what Jones argues was a wide-ranging, "large-scale" inquiry into unrelated arrests and charges we do not consider in the abstract. Had Jones objected and cited the relevant principle of exclusion, it is quite possible the judge would have imposed limitations on the questioning to prevent the sort of bad-character-by-association prejudice that Jones complains of. But he did not object, and even assuming the judge nonetheless should have recognized that the prosecutor was ranging too far afield, any error did not affect appellant's substantial rights. *Olano,* 507 U.S. at 734–35, 113 S.Ct. 1770. Blackson testified only that he saw Tucker and the victim (but not Jones) at the murder scene an hour or so before it occurred; and the prosecutor's summation focused not on Blackson's credibility, but on the fact that Jones could have been inside the building when Blackson was outside it well before the shooting. Moreover, Blackson was impeached with his own pending indictment, something Jones does not challenge. Any undue confrontation of Blackson with the sins of his relatives did not add to his impeachment enough to create plain error.

*Affirmed.*