*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 11-CM-1134

CHARLES A. GRANT, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CMD-4942-11)

(Hon. Herbert B. Dixon, Jr., Trial Judge)

(Argued May 14, 2013                        Decided February 20, 2014)

*Anna B. Scanlon* for appellant.

*Nebiyu Feleke*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, *Elizabeth Trosman*, Assistant United States Attorney, and *Chrisellen R. Kolb*, Assistant United States Attorney, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and EASTERLY, *Associate Judges*, and KING, *Senior Judge*.

KING, *Senior Judge*: On July 12, 2011, appellant Charles A. Grant was convicted by a jury of bias-related threats,[1] and acquitted of bias-related assault (with a bottle),[2] and two counts of possession of a prohibited weapon (a bottle and a knife).[3] On appeal, he contends that his conviction should be reversed because there was a substantial risk that the jury verdict was coerced by the trial court's response to a jury note regarding a "difficult" environment in the jury room, and the trial court violated Superior Court Criminal Procedure Rule 36-I[4] by reading a juror's note to the jury without the court reporter's presence. We affirm.

## I.

On March 18, 2011, at approximately 3:50 a.m., Ryan Barrett was walking home on Georgia Avenue, Northwest, with his two friends, Christopher Fenwick-Williams and Rufus Lofty. The streets were empty, except for Grant, who walked

---

[1] D.C. Code §§ 22-407 (2012 Repl.), -3701 (2012 Repl.), -3703 (2012 Repl.).

[2] D.C. Code §§ 22-404 (2012 Repl.), -3701, -3703.

[3] D.C. Code § 22-4514 (b) (2012 Repl.).

[4] Superior Court Rule of Criminal Procedure 36-I (a) states: "All proceedings shall be simultaneously recorded verbatim by a reporter engaged by the court by shorthand or mechanical means or, when permitted by rule of court, by an electronic sound recording device."

ahead of the group. Grant stopped walking, and as Barrett and his friends walked by, he said "Shut the fuck up, you faggots." Barrett noticed that Grant "smelled of alcohol, . . . was staggering, and his voice was breaking." Barrett and Grant engaged in a verbal altercation, and as Barrett and his friends continued to walk down the street, Grant yelled "Fuck you, faggot, I'll kill a faggot out here. Y'all faggots don't mean nothing to me."

The three men continued to walk away, at which point Barrett was hit in the right elbow with a glass bottle. Barrett did not see Grant throw the bottle, but when he turned around there was no one else in the area. Barrett told Grant that he "would fuck [him] up" and Grant continued to "briskly" follow Barrett and his friends saying, "What? What? You'll do what?", until they entered a nearby McDonald's to call the police. Barrett described Grant to the 911 operator as "a light-skinned black male, standing about 5'9," with a thick build and full facial hair, wearing a black leather jacket and some dark jeans."

Barrett said that Fenwick-Williams told him that Grant had a knife, which Barrett himself did not see. Fenwick-Williams testified that he saw Grant holding something black in his hand, and that he ran toward them saying "he was going to stab [them]." Metropolitan Police Department (MPD) Detective Kristal Boyd,

who responded to the 911 call, testified that when interviewed after the incident, Barrett and his friends mentioned that Grant "appeared to have . . . reached in his pocket as if he had something or was trying to pull something out," but they never mentioned a weapon, or a knife.

MPD officers responded to the area, and about five minutes after the call spotted Grant, who matched the lookout description. MPD Officer Von Galery testified that when they made a U-turn to stop and question Grant, he "made a gesture, throwing a hard object to the ground that made a clinging sound of steel, hitting a steel trashcan." Once out of the police vehicle, Officer Galery "noticed that there was a knife that was on the ground." The officers conducted a show-up procedure and both Barrett and Fenwick-Williams separately identified Grant, stating that he was the individual that threw a bottle at Barrett.

## II.

The jury began deliberations at approximately noon on Friday, July 8, 2011. At 3:45 p.m. the jury sent the court a note that read: "We, the jury, can't come to agreement of the identity of the assailant beyond a reasonable doubt. We need further instructions." Grant requested that the court re-read the identification

instruction to the jury and give an anti-deadlock instruction, and the government suggested that it was premature for an anti-deadlock instruction. The court responded as follows:

> Members of the jury, thank you for your note regarding the status of the jury's discussions. I'm directing that you deliberate further in the case and that you keep an open mind about the case, with a view to listening to others and expressing your own point of view to see whether you can reach a unanimous decision. Please continue with your deliberations.

After being dismissed for the weekend, the jury resumed deliberations on Monday, July 11, and sent a note at 12:30 p.m. reading: "We as a jury are hung." Both parties requested that the court read the *Winters* anti-deadlock instruction, *Winters v. United States*, 317 A.2d 530, 534 (D.C. 1974) (en banc), but the court proposed its own anti-deadlock instruction. Grant's counsel objected to the first sentence of the proposed instruction, but the judge included that sentence in its instruction. The court then read the following (the "anti-deadlock" instruction) to the jury, after which the jurors were dismissed to continue deliberations:

> In many cases, absolute certainty cannot be attained or expected. Although the verdict must be the verdict of each juror and not a mere acquiescence in the conclusion of the other jurors, you should examine the questions

submitted to you with candor and with proper regard and deference to the opinions of each other.

You should consider that it is desirable that the case be decided, that you are selected in the same manner and from the same source from which any future jury must be selected, and there is no reason to suppose that the case will ever be submitted to twelve persons more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on one side or the other.

And with this view, it is your duty to decide the case, if you can conscientiously do so. You should listen to each other's arguments with a disposition to be convinced. Thus, where there is disagreement, jurors for acquittal should consider whether their doubt is a reasonable one, which makes no impression upon the minds of others equally honest, equally intelligent with themselves, and who have heard the same evidence with the same attention and with an equal desire to arrive at a fair verdict and under the sanction of the same oath.

And on the other hand, jurors for conviction ought seriously to ask themselves whether they might not reasonably doubt the correctness of a judgment which is not concurred in by others with whom they are associated and whether they should distress[5] the weight or sufficiency of that evidence which fails to carry a conviction in the minds of their fellow jurors.

The verdict must represent the considered judgment of each juror. In order to return a verdict, each juror must

---

[5] So in original, and in the quotation of this instruction in our recent decision concerning it. *See (Myrone) Williams v. United States*, 52 A.3d 25, 45 (D.C. 2012). The original *Winters* instruction, from which this paragraph of the trial judge's instruction is drawn, uses "distrust" here. *See* Criminal Jury Instructions for the District of Columbia, No. 2-91 (4th ed. rev. 1996).

agree to that verdict. Your verdict, with respect to any charge that you're considering, must in and of itself be a unanimous verdict. So it is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without sacrificing your individual judgment. Each of you must decide the case for yourself, but you do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and the reasons for your views and to change your opinion if you're convinced it is wrong. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors only for the purpose of returning a verdict. Remember, you are not partisans or advocates for either side; you are judges, neutral judges of the facts.

At 3:50 p.m., the court received a note from a juror other than the foreman, which read: "The environment in our jury room has become very difficult. Our ability to incorporate your most recent directions into our deliberations has become almost impossible. Please advise us of our options." In different handwriting, the note also read: "Jury members have been personally 'targeted' by juror members as doing 'a piss poor job.'" As the trial judge was in the middle of selecting a jury for another trial, he proposed to the parties that he and the parties' lawyers enter the jury room, in order to excuse the jury until the following morning. Neither party objected to the procedure.

Before addressing the jury the trial judge indicated he would read the note to the jury, to which counsel for Grant objected arguing that because of the underlying "hostility" it may "offend" a group of the jurors. The government argued that the court should read the note to the jury because "it would be better if they [knew] what it said and they had time in the evening to digest it . . . [and] have a cooling-off period." The court determined that it would read the note and tell them it would "look into and talk to them about" it the next day.

The following morning, the judge stated that he had taken "both counsel with me to the door of the jury room and read the note." The government proposed "allowing the jurors to continue their deliberations . . . to see if they've had time to calm down, and can work together to reach some sort of verdict in this case." Counsel for Grant argued that a mistrial was appropriate because "the individual who was the foreman looked clearly upset" and it was unclear if "what [had] been said in the note can be undone." Counsel also argued that it would be prejudicial "to require the jurors after such a note to continue to deliberate when they have expressed that their disagreement is such that it's reaching a hostile point." The court denied the motion for a mistrial. When the jurors returned to the courtroom, the judge read the note to the jury again, without revealing the identity or the

number of the jurors who signed the note. Then the court instructed the jury as follows to continue deliberations civilly (the "civility" instruction):

> As you know, I have not spoken to any of you about this note. The note concerned me because it's important whether the note represents the opinion of one juror, or whether the note represents the opinion of a majority of jurors – it doesn't matter – it's an important note. Whether it's just one person's opinion or whether it's a majority's opinion on the jury it's very important because it affects the ability of the jury to proceed with its deliberations.
>
> One of the instructions that I gave to you originally concerned the selection of a foreperson. But it's not the selection of the foreperson that I'm referring to, it's the other aspects of that particular instruction.
>
> The instruction talked about the need for discussions to be civil. The instruction talked about the need for jurors to be able to express their views.
>
> And whether a juror agrees with what has been said, or whether a juror disagrees with what has been said, that juror has the right to express their views, and they have the right to express those views without being the subject of a personal attack by any other juror, or to feel that they are the subject of a personal attack.
>
> Jurors disagree in jury deliberations all the time – that's a part of the process. But you can disagree and have discussions about your different views without being disagreeable.
>
> It is important for everyone to speak up regarding their own views with respect to the evidence in the case. It is important for everyone to act civilly on the jury towards

the other, and it is important that each juror feel that – should feel that they have the right to speak up regarding their individual views, whether those views are in agreement with the majority or whether or not those juror's views are different from the majority – it is extremely, extremely important.

Now, once again, I repeat where I started. I don't know whether this note represents the opinion of one juror, or whether this note represents the opinion of a majority of the jurors – even more or less than that – but it's an important note because it affects the ability of a jury to have full, fair, frank discussions in a civil manner, to discuss their disagreements, to attempt to persuade the other, to listen to the other, all with the purpose in mind of resulting in a fair and impartial, and justified verdict in the case.

So once again, I repeat, I've not spoken to any of you about why this note was written, I have no idea if it's just one person's feelings or if it's a majority – more or less – but it's important because it affects the atmosphere in the jury room to have those full, frank, civil discussions without being disagreeable.

Defense counsel objected to the fact that the court never mentioned that "one person, or a group of people are being sensitive," and again moved for a mistrial, which the court denied. Although Grant now offers specific objections to other aspects of the language of the civility instruction, he presented no other objections to the phrasing of the instruction at trial. The jury continued deliberating and at 12:00 p.m. the jury submitted a note reading, "We are done. We have made a

decision on all counts." After the foreperson read the verdict, the court polled the jury and all jurors expressed their agreement.

## III.

On appeal, Grant argues that the violation of Superior Court Criminal Rule of Procedure 36-I, which requires all proceedings to be recorded verbatim, makes it impossible to determine whether the trial court's actions in the jury room further exacerbated the inherently coercive situation. He also argues that the verdict must be reversed because there is a substantial risk that it was coerced. He contends that there were several coercive factors present in the court's "civility" instruction that it read to the jury in response to the third note, including that the note was sent after the court gave a strong anti-deadlock instruction. He also argues that the trial judge exacerbated the inherently coercive situation and created a substantial risk of a coerced verdict by reading the note in the jury room. In addition, Grant argues, for the first time, that the specific language of the trial judge's "civility" instruction was coercive. In that regard Grant emphasizes both the trial court's explicit statement that the "purpose" of continued deliberations was to reach a verdict, and its failure to remind jurors that they should not "abandon their honest convictions in continued deliberations."

The government responds that Grant forfeited any objection to the trial judge's responding to the jury note without the presence of a court reporter. In the alternative, the government argues that Grant was not prejudiced by any error. Additionally, the government responds that at the time of Grant's motion for a mistrial, the jury faced a "difficult" environment, but it did not rise to the level of inherently coercive. Furthermore, the government argues that the trial court properly denied the motion for a mistrial because the court took actions to "effectively temper the potential for coercion." In conclusion, the government argues that the jury reached its verdict "freely and fairly" as demonstrated by the jury poll which revealed no dissent, and the fact that the jury acquitted Grant of three of the charges, including the two most serious charges,[6] while convicting him of only one charge.

---

[6] Grant was found guilty of bias-related threats to do bodily harm under D.C. Code §§ 22-407, -3701 & -3703, which carries a maximum sentence of nine months. Grant was acquitted of bias-related assault under D.C. Code §§ 22-404, -3701 & -3703, which carries a maximum sentence of 270 days. Grant was also acquitted of two counts of possession of a prohibited weapon (knife and bottle) under D.C. Code § 22-4514 (b), which each carry a maximum sentence of one year.

**IV.**

We first address whether the court erred by entering the jury room with counsel for both parties, but without a court reporter, reading the note to the jury, and dismissing them for the evening. This court has held "that the reporting requirements of Rule 36-I (a) are mandatory, and exceptions will be narrowly construed." *(Robert) Williams v. United States*, 927 A.2d 1064, 1067 (D.C. 2007) (quoting *Lucas v. United States*, 476 A.2d 1140, 1142 (D.C. 1984)) (internal quotation marks omitted). However, "[t]he absence of a complete transcript of the trial does not automatically mandate reversal . . . even if it makes appellate review more difficult." *Egbuka v. United States*, 968 A.2d 511, 516 (D.C. 2009) (citations omitted). Instead, "we ask whether the particular omission from the transcript *prejudices* the defendant's right to appeal, either (1) by making it impossible for this court to determine whether a specific error raised by the appellant occurred, or (2) by preventing new appellate counsel from searching the record to determine whether error occurred." *Euceda v. United States*, 66 A.3d 994, 1002-03 (D.C. 2013) (internal quotation marks and citations omitted) (emphasis in original).

Grant argues that because of the omission from the transcript, the record does not indicate whether the identities of the jurors who wrote the note were

revealed to the jury in its entirety, and does not reflect how the court introduced the note, or what was said after reading the note. "Appellant does not allege that a specific error occurred during the part of the proceeding that was not recorded . . . . Appellant argues instead that he is precluded from mounting an effective appeal because there *might* have been some error that would have been captured" had the court reporter been present in the jury room. *David v. United States*, 957 A.2d 4, 7 (D.C. 2008). From the court's discussion with counsel before entering the jury room, and from the court's summary the following morning regarding what had happened in the jury room, "we think that is highly improbable," *id.*, that any specific error was not recorded.

Before entering the jury room, the judge held a discussion with both counsel as to what he would say to the jury, in which the judge never expressed the intent to name the individual jurors who wrote the note, or to state how many jurors signed the note. The judge told counsel that: "I'm just reading the note that I received and telling them it's something I've got to look into and talk to them about, and I don't have time right now." The following morning, the court summarized its discussion with the jury and stated that it "took both counsel with me to the door of the jury room and read the note." Neither counsel objected to the

summation or the procedure, other than defense counsel objecting to reading the note at all.

After the court summarized its discussion in the jury room, Grant moved for a mistrial, arguing that "it's prejudicial . . . to require the jurors after such a note to continue to deliberate when they have expressed that their disagreement is such that it's reaching a hostile point." Defense counsel was unsure if "what has been said in the note can be undone." However, counsel did not further object to the court's proceedings in the jury room, nor did he argue that the judge made statements in the jury room that exacerbated the situation. Grant filed a post-trial motion to include a statement summarizing the interaction in the jury room. The court denied the motion because it "merely recasts information already provided in the transcript of the proceedings without offering any new or additional information about the underlying proceedings." For these reasons, we hold that the court's violation of Rule 36-I (a) is non-prejudicial.

# V.

Grant also argues that the trial court improperly coerced a verdict by giving the "civility" instruction after the jury had returned two notes reflecting their

inability to make a decision, and one note reflecting a difficult environment in the jury room. He contends that any re-instruction at that point was coercive, and the court should have declared a mistrial. We conclude that a mistrial was not required under the circumstances, because the court has discretion to determine how to instruct a jury that is having a difficult time deliberating. *See (Jerome) Jones v. United States*, 999 A.2d 917, 929 (D.C. 2010).

The standard for determining whether there is a substantial risk of juror coercion is well-settled:

> We assess that risk by weighing the 'inherent coercive potential' of the entire situation before the trial court and the ameliorative or exacerbating impact of the judge's actions in response to that situation. We examine the question of coercion from the jurors' perspective. Coercion of a verdict 'does not mean simple pressure to agree.' Rather, pressure to agree is impermissibly coercive when it is likely to force a juror 'to abandon his [or her] honest conviction as a pure accommodation to the majority of jurors or the court.' The question is one of 'probabilities, not certainties'; from our review of the record, we must be able to 'say with assurance' that the jury has arrived at its verdict 'freely and fairly.'

*Hankins v. United States*, 3 A.3d 356, 361-62 (D.C. 2010) (citations omitted). Thus we first consider the inherent coercive potential of the situation from the jurors' perspective, and then we ask how the court responded to that situation. *Id*.;

*see also Harris v. United States*, 622 A.2d 697, 701 (D.C. 1993). Generally, we

consider several factors enumerated in *Harris*.

> Did the judge make affirmative efforts to dispel any coercive potential? Did the judge take a middle course and act (or refrain from acting) in a reasonable and neutral way? Did the judge perhaps compound the problem by actions effectively adding to juror pressure? Did the judge independently create a situation of coercive potential?

*Harris*, 622 A.2d at 705.

But in this case we determine there is no need to consider these questions at

great length because the crux of Grant's coercion argument is one that was not

made at trial and Grant cannot show the requisite prejudice to satisfy our test for

plain error.[7]

---

[7] We note that any objective assessment of the evidence being considered by the jury would indicate that the jury convicted on the strongest count and acquitted on the three weakest counts. On this evidentiary record, it would not be beyond reason to conclude that the "holdouts" were in the minority – in favor of conviction – on the three weakest counts, but eventually came around and joined the other jurors in voting to acquit on those counts.

A jury in these circumstances is particularly vulnerable to pressure to reach a verdict. This is the reason a trial judge may not give a second anti-deadlock instruction. *(Jerome) Jones*, 999 A.2d at 927. The trial judge may re-instruct the jury in other ways, but any subsequent instruction must be carefully drawn to ensure that it does not contain the key components of an anti-deadlock instruction. We agree with Grant's position on appeal that certain aspects of the language in the "civility" instruction were problematic. As these objections raise new concerns about how the exact wording would affect the jury, they are unpreserved.[8] *See Green v. United States*, 718 A.2d 1042, 1056 (D.C. 1998) ("[O]bjections to jury instructions must be specific enough to direct the judge's attention to the correct rule of law; a party's request for jury instructions must be made with sufficient precision to indicate distinctly the party's thesis." (quoting *Russell v. United*

---

[8] Grant did object at the outset to some of the judge's language in the instruction regarding the final note. Grant stated that "some parties may feel like they are being chastised for behavior that they have not even had an opportunity to defend." Grant also requested that the judge "reaffirm that people still have an amendment [sic] to express their views," to which the court responded, "Oh, absolutely. Yes. Yes. Yes." The judge then stated in the instruction that "whether a juror agrees with what has been said, or whether a juror disagrees with what has been said, that juror has the right to express their views, and they have the right to express those views without being the subject of a personal attack by any other juror, or to feel that they are the subject of a personal attack." After the instruction was given, Grant requested that the court "indicate that it's also equally possible that one person, or a group of people are being sensitive." The trial judge noted that he did not see the need to "go back to that" as he had said during the instruction "I don't know whether this is one person's view or a majority view." This specific objection was not renewed on appeal.

*States*, 698 A.2d 1007, 1012 (D.C. 1997) (internal quotation marks omitted))). We therefore review them for plain error. *United States v. Olano*, 507 U.S. 725, 732 (1993); *(Marcus) Jones v. United States*, 946 A.2d 970, 975 (D.C. 2008).

First, Grant objects to the court's statement that the jury should continue deliberations with the "purpose in mind" of reaching a "fair and impartial, and justified verdict in this case." Second, Grant objects that the instruction did not remind the jurors that they must not surrender their honest convictions simply to reach an agreement. He urges that these were errors of commission and omission because they jointly presented a serious risk of verdict coercion. That risk was particularly strong here, he contends, because the jury had just announced, for the third time, that it was having a hard time reaching agreement.

Under plain error review, we reverse only if (1) the trial court erred in including (and omitting) this language from the "civility" instruction, (2) the error was plain, (3) it affected Grant's "substantial rights," and (4) it caused a "miscarriage of justice or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *(Marcus) Jones*, 946 A.2d at 975 (citing *Olano*, 507 U.S. at 732). We conclude that both the omission and the commission

were error, but we do not decide whether they were plain, as we conclude that the errors in any event did not prejudice Grant.

There is much to admire in the court's third instruction, particularly its central message that deliberations must be civil. The instruction was a reasonable attempt to avoid declaring a mistrial where the jury's inability to reach agreement may have been due to a difficult environment in the jury room rather than an intractable conflict in jurors' honest convictions.

However, the court erred in telling the jury its "purpose" was to reach a "fair and impartial, and a justified verdict." Defendants are "entitled to the benefit of a disagreement by the jury," so judges should avoid telling jurors that consensus is preferred over agreement. *Winters*, 317 A.2d at 539 n.10 (Gallagher, J., concurring); *see also Epperson v. United States*, 495 A.2d 1170, 1174 (D.C. 1985). Trial courts err when they instruct jurors, even in predeliberation, that their purpose is to reach a verdict. *(Marcus) Jones*, 946 A.2d at 974. Here, the instruction came after the jury had announced, for the third time, that it was having a hard time reaching a verdict, and after the court had already given an anti-

deadlock instruction.[9]  This makes the instruction, because of the "purpose to reach a verdict" language, perilously close to a second anti-deadlock instruction, which we have repeatedly held to be error.  *Fortune v. United States*, 65 A.3d 75, 86 (D.C. 2013); *Epperson*, 495 A.2d at 1176.  When a jury has announced that it is having a hard time reaching agreement, whatever the reason, the court may not instruct them that their purpose is to reach a verdict.  That specific language remains error even when couched in an instruction whose core message is that discussions must be civil, that each juror has a right to express his or her views, and that disagreements between jurors are "part of the process."

The court also erred when it omitted language reminding jurors that they should not surrender their honest convictions to secure agreement.  *(Marcus) Jones*, 946 A.2d at 974 ("Equally problematical . . . is what the instruction did not

---

[9]  Had the third jury note effectively announced a deadlock, as Grant claims, the court's instruction that the jury's purpose was to reach a verdict would have been error.  But whether a note announces a true deadlock is left to the discretion of the trial court.  Here, the note merely informed the court that there were personal issues in the jury room.  *See Downing v. United States*, 929 A.2d 848, 861 (D.C. 2007) ("[T]he jury note indicating that one of the jurors disagreed with the majority view did not necessarily mean that the trial court was faced with a deadlocked jury."); *Green v. United States*, 740 A.2d 21, 29-30 (D.C. 1999) ("The jury note did not state that it was 'hopelessly deadlocked,' but simply, 'We are unable to reach an agreement.  Please advise.'").  Additionally, the first note, which stated that the jury could not "come to agreement of the identity of the assailant beyond a reasonable doubt" and "need[ed] further instructions," did not announce a deadlock.  *Green*, *supra*, 740 A.2d at 30.

include, which was language balanced against the desirability of agreement that reminded jurors not to surrender their honestly held convictions, even if that prevented agreement."). Any instruction to an admittedly divided jury to keep deliberating risks coercing some jurors to "abandon [their] honest conviction[s] as a pure accommodation to a majority of jurors on the court." *Hankins*, 3 A.3d at 361-62 (quoting *Winters*, 317 A.2d at 532). The court should not tell the jury that agreement is desirable or that its job is to reach a verdict, and it must temper any such message it does convey to that effect with a clear indication that any verdict they reach must not come at the expense of any juror's honest convictions.

We need not decide, however, if these errors were plain. Even if they had been, we are not persuaded that Grant can show that the court's civility instruction prejudiced him. For example, we disagree with Grant that "the verdict itself evidences coercion." As previously discussed, *supra* note 7, the jurors ultimately returned verdicts of not guilty on the assault and weapons charges, where the evidence was weak, but guilty on the threats charge. Grant argues that "[i]t is highly likely that such a compromise verdict was achieved so that the jurors could leave the room after being sent back to deliberate even after the final alarming note." We agree with the government's response to that argument, however, and think that it is likely that the jury unanimously concluded, without coercion, that

the "government proved only the threats charge beyond a reasonable doubt," for which there was strong evidence in support. Both government witnesses identified appellant as the man who threatened them, but neither actually saw Grant throw the bottle at Mr. Barrett. Also, Detective Boyd testified that neither witness mentioned seeing appellant with a knife when she interviewed them.

Grant has not shown a "reasonable probability that, but for [the unobjected-to instruction], the result of the proceeding would have been different." *(Marcus) Jones*, 946 A.2d at 976 (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004)). For the foregoing reasons we are satisfied that Grant has failed to show he was prejudiced by the "civility" instruction.

Accordingly, the trial court's judgment is

*Affirmed*.