Melvin **BONILLA**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 03–CF–879.

District of Columbia Court of Appeals.

Argued Sept. 27, 2005.

Decided March 9, 2006.

■

---

Jennifer C. Daskal, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Michael A. Columbo, Assistant United States Attorney, for appellee. Kenneth Wainstein, United States Attorney, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and David B. Goodhand, and Chad T. Sarchio, and Aaron H. Mendelson, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and KRAMER, Associate Judges, and BELSON, Senior Judge.

KRAMER, Associate Judge:

At the conclusion of a jury trial, the appellant, Melvin Bonilla, was found guilty of the armed robbery of complainant, Harold Romero,[1] and assault with intent to commit robbery while armed of complainant, Jose Hernandez.[2] On appeal, he contends that the trial judge erred in declining to give a jury instruction stating that his theory of the case was that no robbery or assault with intent to rob had occurred, but rather that there had been a fight. Since the trial record shows no evidence that such a fight actually occurred, the trial court did not err in declining to give such an instruction. We affirm.

### I. Evidence at Trial

The evidence at trial came in solely through the government's witnesses—the complainants Harold Romero and Jose

---

1. See D.C.Code § 22–2801,—4502 (2001).

2. See D.C.Code § 22–401, –4502 (2001). The appellant was acquitted on the charge of assaulting Romero.

Hernandez, and Metropolitan Police Officer Edward Shymansky.[3] Viewed in the light most favorable to the government, the evidence shows that on the evening of December 10, 2002, the complainants—friends and construction company owners—had gone out drinking. In the early morning hours of the next day, they arrived at an after-hours club on Fourteenth Street, Northwest, in Romero's truck. After about half an hour in the club, Hernandez returned to the truck to make a phone call, while Romero remained inside speaking to Jamie Acosta, who was indicted, but not tried, with the appellant.

Eventually, Romero and Acosta left the club together so that Romero could obtain one of his business cards from the truck for Acosta. While Hernandez watched Romero and Acosta from the truck, the appellant approached them, grabbed Romero's head from behind, pulled a knife from his pocket and put the knife to Romero's throat. Acosta then reached into Romero's pocket and took his wallet. After taking the $40.00 that was in the wallet, the appellant and Acosta started grabbing at Romero, shaking him and demanding more money. When Romero told them that he had no more money, they took him over to the truck and demanded money from Hernandez. Although Hernandez offered them $20.00, the appellant insisted upon $100.00. Hernandez, who did not have $100.00, tried to negotiate a lower amount so that Romero would not be harmed.

Becoming infuriated, the appellant swung his knife at Hernandez, who, fearing for his life, hit the accelerator, causing the truck to leap forward and the door, which was open, to hit a tree. The appel-lant, Acosta and Romero, who had all been leaning forward into the truck, were pushed out by the acceleration. The appellant punched Romero in the face, and Romero jumped into the truck, making no effort to fight back, since as he explained, they had a weapon and there were two of them and only one of him. With Romero in the truck, Hernandez immediately drove off, calling 911 on his cell phone to report the robbery and give the police a description of the appellant and Acosta.

Hernandez followed the appellant and Acosta down Fourteenth Street, and Hernandez and Romero saw the two briefly hide behind a red Honda Accord, then split up, with the appellant quickly walking off down Fourteenth Street. Hernandez told Romero to jump out and follow him, but to "stay away from him because he had a knife." Thus, Romero approached the appellant, stood about two feet away from him, and asked that he return his wallet. The appellant replied that he did not have Romero's wallet.

According to Romero's estimate, he was out of the truck and talking to the appellant for about two to three minutes before Officer Shymansky arrived on the scene in response to Hernandez's 911 call. Upon his arrival, the officer saw the appellant, Romero and Hernandez (who testified that he had gotten out of his truck to prevent the appellant from escaping) facing each other on the street. Officer Shymansky testified that "a few feet" separated the three, and although Mr. Hernandez and Mr. Romero were pointing at the appellant, and it looked like they were "getting ready to" fight, "they weren't close enough to touch each other."[4]

---

3. The appellant put on no evidence.

4. Specifically, on cross-examination, the following exchange took place between Officer Shymansky and defense counsel in the con-text of what the officer saw when he arrived on the scene:

> Question: And, actually, [the appellant] was just simply standing on the corner, right?

The complainants identified the appellant as the man who had put the knife to Romero's throat. Shortly thereafter, Acosta, who had returned to the after-hours club where he had first met the complainants, was located and identified by Romero as the other person involved with the robbery. In a search incident to arrest, Romero's business card and $132.00 were recovered from Acosta, and $14.00 was recovered from the appellant. Romero's wallet and papers with his name on them were recovered from the area of the red Honda where the appellant and Acosta had bent down.

## II. Closing Arguments

During the initial discussion of jury instructions, counsel asked the court to give a "general denial instruction" as the defendant's theory of the case. Because there is no standard instruction for a defense theory of "general denial" included in the standard Criminal Jury Instructions for the District of Columbia (4th ed. rev.) (Redbook), and none had been drafted and submitted to the court as required by Super. Ct.Crim. R. 30,[5] it was agreed that co-counsel for the appellant would draft a

"theory of the case" instruction during the closing arguments.

During the government's initial closing argument, the prosecutor argued that the appellant had aided and abetted Acosta in taking the wallet from Romero's pocket. There was no other reason, he argued, why the appellant would have put the knife to Romero's neck. As the prosecutor stated: "This isn't a fight. You've heard no evidence of a fight."

The defense counsel's closing emphasized the presumption of innocence and the government's burden of proving guilt beyond a reasonable doubt. Counsel argued repeatedly that the evidence did not support the government's claim that there had been a robbery that night, an argument amounting to a general denial. Indeed, counsel stated: "What may have happened was some sort of fight out there that we don't know about. Whatever it was, it wasn't a robbery." Thus, defense counsel did no more than speculate that there "may" have been "some sort of fight," adding that "we don't know about" the fight.[6]

---

Answer: He was facing the complainants at that time when we pulled up.

Question: That's actually right. I want to talk to you about that for a moment. You said he was facing the complainants. Could you see how close they were to each other?

Answer: They were fairly close to each other.

Question: Actually, it looked like a fight was going on, right?

Answer: It was getting ready to, yes.

Question: Right. Between the two of them?

Answer: They were pointing to him though.

Question: Not just pointing at him because two of them were close enough to the person that they say had a knife that it looked like to you that they were about to start a fight?

Answer: They weren't that close, no. There was a few feet in between, yes.

Question: About how many?

Answer: I don't remember exactly, but they weren't close enough to touch each other.

5. Rule 30 provides in pertinent part: "At the close of the evidence or at such earlier time during the trial as the Court reasonably directs, any party may file written requests that the Court instruct the jury on the law as set forth in the requests .... The Court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury." The issue raised in this appeal would appear to be a direct result of the appellant's noncompliance with this Rule and illustrates the wisdom of not proceeding to closing arguments until the jury instructions have been finalized.

6. At a later point in the defense's closing, counsel was even less certain on the issue of a fight. She told the jury: "This was not a

## III.  Jury Instructions

After the government's rebuttal closing, the court asked for the written instruction that co-counsel had been preparing on the defendant's theory of the case.  The relevant portion of the instruction proffered by the defense was as follows:

> [T]he defense asserts that there was no robbery on the night of 12–10–02. Rather that a fight ensued in the area of 14th and Randolph .... If you believe there was no armed robbery and that the government has not proven there was a robbery beyond a reasonable doubt, you must find [the appellant] not guilty.[7]

In support of this instruction, the defense proffered Romero's testimony that at one point he thought that the defendants wanted to "fight again," asserting that Romero would not have used the word "again" if there had never been a fight. Further, the defense pointed to testimony that "there was a slap and/or a punch," which according to counsel, "certainly is evidence of a fight."  In response to that argument, the court stated: "That is not a fight.  A fight is when two people hit each other.  When somebody punches somebody else, that's an assault."  Counsel conceded the point, noting: "The witness indicated that he did not strike back and that he didn't know why he didn't strike back."

Ultimately, despite the defense's speculation during closing argument that there "may" have been some sort of fight, but that "we don't know about the fight," defense counsel represented to the court:

> I'd like to make my record clear that the defense believes that there is not only evidence of a fight through both the complaining witnesses, but Mr. Romero specifically said that he believed that the person wanted to fight *again.*  And with his answer being yes, that is clearly evidence of a fight and we would ask the Court to give some of the language as proposed by the defense instruction.

(emphasis added).

In the end, the court agreed to give the following instruction as the defense theory of the case:

> [The appellant] asserts that there was no robbery on the night of 12–10–02. He contends that he did not commit the offenses with which he's been charged and that the complainants are mistaken in their identification of him as a participant in these offenses.

Because it found "no evidence of a fight," the court declined to give an instruction based on the defense assertion that there had been a fight.

On appeal, the appellant contends that the trial court erred in refusing to instruct the jury on his theory that there had been no assault with intent to rob or robbery, but merely a fight between him and the complaining witnesses.  Although the word "fight" has multiple definitions,[8] we

---

robbery.  And even if you think there was a fight out there, ladies and gentlemen, who was out there fighting?"

7.  The court ruled that it was unnecessary to give the final two sentences because what is encompassed therein was covered elsewhere in the instructions, and no objection was raised to that ruling.

8.  The term "fight" has several distinct meanings, including: "1. A confrontation between opposing groups in which *each attempts to harm or gain power over the other,* as with bodily force or weapons. 2. A quarrel or conflict. 3. a. A physical conflict between two or more individuals. b. *Sports.*  A boxing or wrestling match. 4. A struggle to achieve and objective .... 5. The power or inclination to fight; pugnacity ...." *The American Heritage Dictionary of the English Language* 679 (3d ed. 1992) (emphasis added).

presume that the appellant refers to a mutual fight between opposing groups or individuals, as did the trial court, because this is the only definition that would benefit him and would be consistent with his plea of not guilty to the armed assault with the intent to rob and the armed robbery charges. Since there was no evidence adduced at trial that could reasonably support a theory that such a fight had occurred, the trial court did not err in rejecting that theory.

## IV. Analysis

■■■ "As a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Adams v. United States,* 558 A.2d 348, 349 (D.C.1989) (citing *Mathews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)); *see also Simms v. United States,* 867 A.2d 200, 204 (D.C.2005) (the defense must be "fairly raised by the evidence") (quoting *Martin v. United States,* 452 A.2d 360, 362 (D.C.1982)). On the other hand, "[t]he trial court ... may properly decline to give a requested instruction when there is no factual or legal basis for it." *Carter v. United States,* 531 A.2d 956, 959 (D.C. 1987) (citing *Taylor v. United States,* 380 A.2d 989, 994–995 (D.C.1977)). "In determining whether a defense instruction was properly denied, we review the evidence in the light most favorable to the defendant." *Adams, supra,* 558 A.2d at 349 (citing *Richardson v. United States,* 131 U.S.App. D.C. 168, 169, 403 F.2d 574, 575 (1968)).

■■■ In arguing that the trial court erred in failing to give the defense theory of the case that there was no robbery and that, instead, there was a fight, the appellant asserts: "Not only did one of the complainants [Acosta] testify that he

thought that appellant wanted to fight 'again,' it was uncontroverted that the complainant was standing face-to-face with the alleged perpetrator of an armed robbery several minutes after the robbery allegedly occurred." Thus, the appellant contends "these facts more than 'fairly raised' the possibility that there had been a fight, and not a robbery."

A review of the record, however, reveals that the context in which Acosta gave the testimony about "fighting again" does not support the appellant's theory of a mutual fight between the appellant and Romero. When asked about the time period immediately preceding the arrival of the police— the only time period to which the "fight again" phrase could possibly refer—the following exchange took place between counsel and Romero:

> Defense Counsel: Now, actually, when you got close to the [the appellant], isn't it a fact that you said that person wanted to fight again? Haven't you said that before, that the person wanted to fight you again?
>
> Romero: Right.
>
> Defense Counsel: And so that the person that you were talking to at that point, you were so close to them that is seemed to you that they wanted to fight you again?
>
> Romero: Right.

Before being asked this question by defense counsel, Romero had not previously testified during the trial that Acosta wanted to "fight again." Nor did defense counsel ever elicit from Romero (or any other witness) when it was that he had used the phrase "fight again" or the context in which he had said it. Moreover, as noted previously, "fight" is a word with multiple meanings.[9] Without any knowledge of the

---

**9.** See *supra,* note 8, defining a fight as, *inter*     *alia,* a confrontation between two parties

context in which he had previously used the word, the record here, with testimony solely of the assaults on and the robbery of Romero, suggests that Romero used the word "fight" in referring to the assault on him. Apart from the appellant's speculation based on the language of a leading question during cross-examination, there is no evidence to support a contrary conclusion.

Indeed, the appellant's argument that the word "fight" meant some sort of mutual combat is contrary to the trial testimony of Romero, Hernandez, and Officer Shymansky—testimony that, with the exception of small details, is entirely consistent. Romero, for example, testified that after being robbed he did not attempt to fight because he was alone facing both the appellant, who had a weapon, and Acosta (Hernandez being in the truck). Officer Shymansky testified that when he arrived on the scene, it may have looked like they were getting ready to fight, but no fight was in progress. Thus, in light of the direct evidence to the contrary and the ambiguous nature of the "fight again" language, this was not a defense "fairly raised by the evidence." *Carter, supra,* 531 A.2d at 959 (citations omitted) (testimony in an assault with an automobile case that the appellant had been driving in an "erratic and confused manner" was insufficient to support a defense instruction that the appellant was not in control of the vehicle); *see also Frost v. United States,* 618 A.2d 653, 661 (D.C.1992) (request for an instruction on self-defense denied where "there was no evidentiary basis for such an instruction"); *Doby v. United States,* 550 A.2d 919, 920 (D.C.1988) (request for an instruction on defense of property denied because "there [was] no factual or legal

basis for it" where the appellant's evidence at trial demonstrated that he was using the pistol to "vindicate a principle" rather than repossess his property). Moreover, if given, the appellant's proposed instruction would have invited the jury to engage in speculation and a "trial court is not required to instruct the jury on a defense theory that indulges or encourages speculation about events or beliefs not supported by testimony." *(Edmond) Graves v. United States,* 554 A.2d 1145, 1149 (D.C. 1989) (citing *Day v. United States,* 390 A.2d 957, 963 (D.C.1978), *overruled in part on other grounds by (Whitfield) Graves v. United States,* 490 A.2d 1086, 1105 n. 19 (D.C.1984)); *see also Griffin v. United States,* 861 A.2d 610, 615 (D.C.2004) ("[T]he evidence is insufficient if . . . the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation.") (quoting *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987) (citations omitted)).

In the alternative, the appellant points to the complainants' pursuit of the appellant after the alleged robbery as evidence in support of his fight theory. He argues that men claiming to have been robbed at knife-point would be unlikely to follow their assailant, and that a fight more accurately accounts for this behavior. A theory, however, is not evidence, and the testimony about the complainants following the robbers was strongly corroborated by the 911 call made by Hernandez that actually brought the police to the scene. Since the appellant chose not to testify, the jury was left solely with the testimony of the government's witnesses. Consequently, as defense counsel aptly put it in its closing

where each attempts to harm the other or a physical conflict between two or more individuals.

argument, "we don't know about" any fight that "may have happened."

Nor, contrary to the appellant's position, does *Hernandez v. United States,* 853 A.2d 202, 204–205 (D.C.2004), support his position. There, we held that the appellant was entitled to a self-defense instruction because an expert witness opined that scratch marks and injuries on the appellant's back could have been caused by the appellant having been attacked. Here, there was no affirmative evidence adduced that could reasonably be understood to show mutual combat. Because it had no factual basis, the trial court properly declined to give the requested instruction. *See Carter, supra,* 531 A.2d at 959–960.

For the forgoing reasons, the convictions are

*Affirmed.*