Jerome H. **JONES**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 07–CF–541.

District of Columbia Court of Appeals.

Submitted Feb. 16, 2010.

Decided Aug. 5, 2010.

Daniel K. Dorsey, Washington, DC, was on the brief for appellant.

Channing D. Phillips, Acting United States Attorney at the time the brief was filed, Roy W. McLeese III, John P. Mannarino, and James M. Perez, Assistant United States Attorneys, were on the brief for appellee.

Before OBERLY, Associate Judge, and KERN and KING, Senior Judges.

OBERLY, Associate Judge:

Appellant Jerome H. Jones was indicted on one count of assault with intent to kill while armed ("AWIKWA"), one count of possession of a prohibited weapon (box cutter) ("PPW"), and one count of obstruction of justice (asking witness for false testimony), based on his role in a nightclub fistfight that ended in one man, Terrance Brown, dying. After a jury trial, Jones was found not guilty of AWIKWA and the lesser included offense of assault with a dangerous weapon. He was found guilty of the lesser included offense of simple assault,[1] possession of a prohibited weapon[2] and obstruction of justice.[3] On ap-

---

1. D.C.Code § 22–404(a) (2001).

2. D.C.Code § 22–4514(b) (2001).

3. D.C.Code § 22–722(a)(2)(A) (2001).

peal, Jones first argues that there was insufficient evidence to support the obstruction of justice charge. Second, he argues that the trial court erred in refusing to give the jury a self-defense instruction. Third, Jones argues that the trial court coerced the jury into reaching its verdict of guilty on simple assault, PPW, and obstruction of justice by giving anti-deadlock instructions. We reject each of Jones's arguments, and affirm the trial court's judgment of conviction.

## I. Facts

On a Saturday night in 2005, Terrance Brown and his nephew, Ladell Brown, went to Club U in the District. The dance floor at the club was crowded, so much so that "[a] lot of people ... [were] packed together ... everybody [was] crowded trying to be on the little dance floor." While dancing, one witness saw Terrance and appellant Jones "exchange elbows" with each other, probably due to the crowded space. As Ladell sought Terrance to get a drink at the bar with him, Ladell saw a "dark" man with dreadlocks push Terrance. Terrance responded by "swinging" toward the man who pushed him. Two eyewitnesses then saw Jones, who wore his hair in dreadlocks at the time of the incident, pull a box cutter from his pocket and begin hitting Terrance. A fistfight ensued and other people jumped into the fray. A club security guard pulled apart the fighters and took Terrance outside the club because he seemed to be the person several people were fighting. The guard testified that Terrance told him he'd been stabbed so the guard went to go get help but he was distracted by having to break up another fight. Another security guard saw that Terrance was lying on the ground and went to investigate; that guard testified that Terrance said, "I can't believe he stabbed me." The guard noticed Terrance's wound and provided medical assis-

tance, but Terrance died shortly thereafter.

## II. Obstruction of justice conviction

At trial, the government presented evidence that after the fight at the club, Jones asked his friend Jennifer Moore if she would say she had been at the club with Jones, even though she had not been there. Although Jones's exact words were unclear, Moore testified that Jones phrased his request for her to lie by beginning with the words, "if I was to ask you ..." but that he "never told [her] to go to anyone and say that [she had been] at the club." Moore agreed to Jones's request, and later, "on her own accord," Moore told a defense investigator that she was with Jones at the club on the night of the fight. She later recanted that statement to the investigator and testified that she was not with Jones at the club. Based on Jones's request for Moore to lie, the government charged Jones with obstruction of justice.

Under D.C.Code § 22–722(a)(2)(A), "[a] person commits the offense of obstruction of justice if that person ... corruptly persuades another person ... [or] endeavors to influence, intimidate, or impede a witness ... in any official proceeding, with intent to ... [i]nfluence, delay, or prevent the truthful testimony of the person in an official proceeding." We have stated that "'indubitably, one is a witness, within the meaning of [the obstruction of justice statute], when he knows or is supposed to know material facts, and expectably is to be called to testify to them.'" *(Darryl) Smith v. United States*, 591 A.2d 229, 231 (D.C.1991) (quoting *United States v. Jackson*, 513 F.2d 456, 459 (D.C.Cir.1975)).

▬ Jones first argues that the government was not able to prove that he had the intent to influence a *witness*, as is required by the statute, because he did not know that Moore would be called as a witness in

his case. Second, Jones asserts that his statement to Moore was "a conditional statement that never actually directed Moore to do anything." According to Jones, he "only asked [Moore] whether [she] would make such a statement if he needed her to do that, and he never 'went that next step to ask [her] to lie and say [she was] at the club.'"

Jones's argument fails in light of *Smith*. In that case, the appellant approached his friend, who had not been at the scene of a killing, and asked the friend to testify that he had been with Smith during the killing and had witnessed someone other than Smith commit the crime. 591 A.2d at 230. The government charged Smith with obstruction of justice, and Smith, like Jones, argued that because his friend was not at the scene of the killing, he was not a witness when Smith talked to him; thus, Smith claimed he had not tried to encourage a *witness* to lie about Smith's involvement in the crime. *Id.* at 232. We affirmed Smith's conviction, reasoning that the obstruction of justice offense "covers the broad category of participants, *potential or actual*, ... and its application extends not only to those who inherently fall within that category by their actual knowledge of material facts but those as well who are by the defendant's own acts brought within that category." *Id.* (emphasis added).

Here, as in *Smith*, we will affirm the trial court's judgment of conviction. Like the defendant in *Smith*, Jones "vest[ed]" Moore "with the status of one who 'may know' or 'is supposed to know,'" thus making Moore a witness within the meaning of the statute. 591 A.2d at 232. As explained above, by his actions, Jones brought Moore within the category of "witness" because he asked her if she would lie about the night in question. Moore was not at the scene and knew nothing about the incident; had Jones not spoken to her,

Moore would not have been a witness. It was only Jones's request that she lie, if he asked her to do so, that made Moore a witness with information that would require her to testify.

Jones's second attack on the obstruction count—that his conditional request for Moore to lie was not an effort to obstruct justice because Jones "never actually directed Moore to do anything"—fails as well. One commits obstruction of justice if one "endeavors to influence" a witness in an official proceeding with the intent to "influence, delay or prevent the truthful testimony of the person in an official proceeding." D.C.Code § 22–722(a)(2)(A). As we have stated, "[t]he gist of the crime is the endeavor to interfere with the administration of justice," and "[t]he use of the term 'endeavor' does not require success or even an overt attempt; it merely requires that the defendant have made 'any effort or essay to accomplish the evil purpose that the [statute] was enacted to prevent.'" *Irving v. United States*, 673 A.2d 1284, 1289 (D.C. 1996) (citing *Ball v. United States*, 429 A.2d 1353, 1359 (D.C.1981), and quoting *United States v. Russell*, 255 U.S. 138, 142–43, 41 S.Ct. 260, 65 L.Ed. 553 (1921) (affirming Russell's conviction of "corruptly endeavoring to influence a juror" based on his attempt to pay a potential juror in his case, despite Russell's argument that he "was only in preparation of a sinister purpose," but had not yet attempted to influence the juror)).

Here, despite Jones's claim that he was only seeking a promise from Moore to lie if he later called upon her to do so, a jury easily could have found that his attempt to secure Moore's assurance on this question was an "endeavor to interfere with the administration of justice." Whether Moore definitely promised to lie, or whether Jones later called upon her to make

good on her promise are irrelevant questions; there was sufficient evidence that Jones "endeavored," that is, made an "effort or essay to do or accomplish the evil purpose that the section was enacted to prevent," to influence Moore to lie and therefore to obstruct justice. *Russell,* 255 U.S. at 143, 41 S.Ct. 260.

### III. Self-defense instruction

At trial, Brown's nephew testified that as he was going to the bar within the club, a "dark" man wearing dreadlocks—a description that fit Jones—pushed Brown and that Brown responded by "swinging towards to [sic] hit him." As the fight escalated, two witnesses who knew Jones saw him retrieve a box cutter from his pocket. A government witness also testified that during a conversation the day after the fight, Jones told her that he had stabbed Brown because Brown had been bumping into him while they were dancing. Jones requested a self-defense instruction, but the trial court refused, stating "if Terrance Brown took the first swing ... it was only in response to the act of aggression [pushing Brown] by the defendant. And the mere fact that it was described by one witness as saying that Terrance Brown took the first swing is insufficient to merit a self-defense instruction." Jones argues on appeal that the trial court erred in denying his request for an instruction on self-defense because he "believed he was acting in self-defense after [Brown] bumped into him numerous times" on the dance floor, and because Brown took the first swing during the fight.

"In reviewing claims of instructional error, we view the evidence in the light most favorable to the defendant in order to ascertain whether there 'exist[ed] evidence sufficient for a reasonable jury to find in his favor.'" *Muschette v. United States,* 936 A.2d 791, 798 (D.C.2007) (quoting *Bonilla v. United States,* 894 A.2d 412, 417 (D.C.2006)). But "[a] requested instruction is not appropriate if, as a matter of law, the defendant would not be entitled to the defense." *Barnhardt v. United States,* 954 A.2d 973, 976 (D.C.2008).

A trial court "may properly decline to give [a defendant's requested] instruction when there is no factual or legal basis for it." *Bonilla,* 894 A.2d at 417 (quotation marks omitted). An instruction on self-defense is warranted only if "the record [reflects] that: (1) there was an actual or apparent threat [to the defendant]; (2) the threat was unlawful and immediate; (3) the defendant honestly and reasonably believed that he was in imminent danger of death or serious bodily harm; and (4) the defendant's response was necessary to save himself from danger." *Rorie v. United States,* 882 A.2d 763, 771 (D.C.2005) (citing *Hernandez v. United States,* 853 A.2d 202, 205 (D.C. 2004)).

We see no error in the trial court's ruling that Jones was not entitled to the instruction. It may be that Brown bumped into Jones on an overcrowded dance floor or that Brown threw the first punch in the fistfight. But from the testimony presented by the government and Jones, a reasonable juror could not have found, without speculating, that Jones "honestly and reasonably believed that he was in imminent danger of death or serious bodily harm," or that Jones's use of a box cutter "was necessary to save himself from [the] danger" posed by Brown's initial punch. *Rorie,* 882 A.2d at 771. The evidence to support the trial court's giving a self-defense instruction "is insufficient if the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation." *Bonilla,* 894 A.2d at 418 (quoting *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987) (internal editing omitted)). A self-defense instruction in Jones's case

would have asked the jury to cross into that "forbidden territory."

## IV. Jury deliberations

▮ Jury deliberations in this case did not go smoothly. After the six-day trial, the jury sent eleven notes[4] to the trial judge over the course of nine days of deliberations; in addition to discussing recessing and announcing that they had reached a verdict, the notes asked evidentiary questions, informed the court that the jury was "at an impasse" and could not reach a verdict, and complained about an "obstructionist" juror who, by one account, refused to participate in the deliberations. The trial court dealt with each note in turn, but we must evaluate "[a]ny alleged coercion ... in context and with regard to all the circumstances of the case." *Harris v. United States,* 622 A.2d 697, 701 (D.C. 1993) (citing *Johnson v. United States,* 360 A.2d 502, 504 (D.C.1976)). After examining each of the trial court's actions, in addition to considering the deliberations as a whole, we conclude that the manner in which the judge presided over the jury deliberations did not coerce a verdict.

### A. Predeliberation instruction

▮ First, Jones argues that the court's predeliberation instruction was erroneous because it allegedly "warned" the jury that "nothing less than a verdict was 'just and proper.'" The judge instructed the jury, "The final test of the quality of your service will lie in the verdict that you return to this courtroom, not in the opinions any of you may hold before agreement on a verdict. Bear in mind that you will make a definite contribution to efficient judicial administration if you arrive at a just and proper verdict in this case." Jones's claim of error to this instruction is one that he did not make at trial, and therefore we review this instruction for

plain error. *See United States v. Olano,* 507 U.S. 725, 731–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

Since Jones's trial, we have held that an instruction such as the one the judge gave to the jury before deliberations in this case is erroneous because "it conveys an evident bias favoring [the jury's reaching a verdict]" due, in part, to the concept of the "'final test,' [which] implies that there is a standard of service to which a juror should aspire, one that requires a verdict to be reached rather than one that requires consideration of individual conviction and whether individual conviction thoughtfully can be reconciled with collective judgment." *(Marcus) Jones v. United States,* 946 A.2d 970, 974 (D.C.2008) (citation and internal quotations omitted). "Jurors should not be told impliedly that they fail the 'test' of responsible service if they do not overcome their 'opinions' and reach agreement on a verdict." *Id.*

Because Jones cannot show that the instruction was erroneous at the time of trial, we cannot say that the error in giving this instruction was "'obvious or readily apparent,' and 'clear under current law,'" as is required under plain error review. *Coates v. United States,* 705 A.2d 1100, 1104 (D.C.1998) (quoting *Hasty v. United States,* 669 A.2d 127, 134 (D.C. 1995)); *see (Marcus) Jones,* 946 A.2d at 976. Further, Jones cannot show that the instruction was "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial," *Coates,* 705 A.2d at 1105, because there is no indication that this predeliberation instruction improperly affected the jury, as evidenced by the four days of deliberation before the jury first informed the court of a deadlock. *See (Marcus) Jones,* 946 A.2d at 976 (holding no plain error where jury deliberated for nine hours before reaching deadlock).

---

4. All notes were sent by the foreman unless otherwise indicated.

Jones's argument that the predeliberation instruction was plainly erroneous therefore cannot prevail.

## B. *Winters/Gallagher* instruction

After the court gave the predeliberation instruction, the jury began deliberations on Wednesday, January 17, 2007, and about three hours later sent its first note, asking about one witness's grand jury testimony and whether the jury would have access to a videotaped interview of two witnesses. The trial judge succinctly informed the jury that they had all the evidence admitted at trial.

On the fourth day of deliberations, January 22, the jury sent the second, third, and fourth notes. The second note asked if the jury could return a verdict on fewer than all three charges. The trial judge responded that they indeed could return a verdict on only some of the charges and then continue deliberating on the remainder. The third note advised that the jury was "at an irrefutable impasse" and unable to reach a verdict. In response to this note, the judge asked the jury to keep deliberating but told them that he "may have a further response, either this afternoon or tomorrow." The fourth note contained a request to go home early for the day pursuant to an earlier offer by the court.

The next morning, Jones's counsel moved for a mistrial, and the trial court denied the motion. After hearing from both counsel, the court gave an instruction to the jury that was "an amalgamation of the existing anti-deadlock instructions." The instruction was comprised mostly of the *"Winters* Instruction,"[5] but also in-

cluded two additional paragraphs taken from the *"Gallagher* Instruction."[6]

The *Winters* instruction told the jurors that "[a]lthough the verdict must be the verdict of each juror and not a mere acquiescence in the conclusion of other jurors ... [they] should examine the questions submitted to [them] with candor and with proper regard and deference to the opinions of each other." The court continued, "[y]ou should listen to each other's arguments with a disposition to be convinced," but that the "verdict must represent the considered judgment of each juror." To these instructions, the court added language from Judge Gallagher's concurrence in the *Winters* case that advised the jurors that it was their duty "to consult with one another and to deliberate with a view to reaching an agreement if [they could] do so without sacrificing [their] independent judgment." The court emphasized that the jurors should "not surrender [their] honest conviction as to the weight or effect of evidence solely because of the opinion of [their] fellow jurors only for the purpose of returning a verdict," and reminded them, "[y]ou are not advocates for either side. You are judges, judges of facts. Your sole interest is to find the truth from the evidence in the case."

Jones asserts that the court's telling the jury that its "sole interest is to find the truth from the evidence in the case," in addition to giving the *Winters* instruction, "had coercive potential" because *Winters* represents the "highwater mark" of anti-deadlock instructions. We do not agree.

"Which 'anti-deadlock' instruction [the court] gives is in the discretion of the

---

5. *See Winters v. United States,* 317 A.2d 530, 534 (D.C.1974) (en banc), quoting Criminal Jury Instructions for the District of Columbia, No. 2.91(B) (4th ed. rev. 2008) (now codified at No. 2.601(B) (5th ed. 2009)).

6. *See Winters,* 317 A.2d at 539 (Gallagher, J., concurring), quoting Criminal Jury Instructions for the District of Columbia, No. 2.91(C) (4th ed. rev. 2008) (now codified at No. 2.601(C) (5th ed. 2009)).

trial judge," *Epperson v. United States,* 495 A.2d 1170, 1173 (D.C.1985), and this court has approved the *Winters* instruction for a trial court's charge to a deadlocked jury. *See Davis v. United States,* 700 A.2d 229, 231 n. 4 (D.C.1997). Although we have cautioned that the language from *Winters* is "the highwater mark" of an anti-deadlock instruction "because it carries [the] 'sting' in favor of a verdict," *(Marcus) Jones,* 946 A.2d at 975, the sting in this case was tempered by the judge's addition of the *Gallagher* language that encouraged the jurors to come to an agreement only "if [they could] do so without sacrificing [their] independent judgment" and that told the jurors not to "surrender [their] honest convictions ... for the purpose of returning a verdict." Because of its inclusion of this language, the *Gallagher* charge has been sanctioned by this court as a "milder 'anti-deadlock' charge than the language suggested by the *Winters* majority" for use as an "alternative instruction in the discretion of the trial court." *See Green v. United States,* 740 A.2d 21, 24 n. 7, 28 (D.C.1999).

We believe that the addition of the *Gallagher* language in this case softened the already-permissible *Winters* instruction beyond the point that Jones has no basis for complaint. The judge did not abuse his discretion in addressing the jury in this way and in fact seemed to have acted out of an abundance of caution by supplementing the *Winters* instruction with the *Gallagher* language. His instructions to the deadlocked jury included "language balanced against the desirability of agreement that reminded the jurors not to surrender their honestly held convictions, even if that prevented agreement." *(Marcus) Jones,* 946 A.2d at 974.

## C. Trial court's inquiry

■ After receiving the judge's instruction to continue deliberating, on the sixth day of deliberations, January 24, a juror who was not the foreman sent the fifth note, a one-page note complaining that the jury was deadlocked. Jones argues that when the court received this note, it should have recognized that the jury was still deadlocked and granted his motion for a mistrial. Instead, the court responded by asking the entire jury if the sentiments expressed were those of one juror or the entire jury: "[T]o address certain issues, I need to have an understanding as to, as to what the jury is telling me as opposed to one individual member. So out of an abundance of caution I'm asking you tomorrow to ... discuss whether or not this is a note of the jury and if so just send me another note to let me know." The judge then advised the jurors that they also should let him know if he could "be of assistance ... if there's any further instruction [he could] give that might clarify anything that [the jury] believe[d]." The jury returned to the jury room and did not communicate further with the judge that day. The following morning, January 25, another individual juror sent to the court the sixth note, asking whether Jones was right or left-handed and whether he wore jewelry—questions that would seem to indicate the jury was not deadlocked but was instead continuing its deliberations.[7]

Contrary to Jones's argument, the trial court's directive on January 24 for the jury as a whole to send a note if they were indeed deadlocked did not amount to coercion that forced one or more jurors to "conform" to the majority's vote, as evi-

7. The judge responded to this note by telling the jury that he was not permitted to answer those questions, and said, "You are going to have to judge the case based on your memory and your recollection of the evidence and based on the evidence that was presented to you."

denced by the sixth note's asking about Jones's handedness and jewelry. Because the fifth note did not come from the foreperson, the trial court was striving to ascertain if the deadlock was the sentiment of the jury as a whole or only that of a lone juror. Nothing in the court's inquiry expressed a bias favoring a verdict or that it was desirable that the jury reach a verdict. *See (Marcus) Jones,* 946 A.2d at 974 (noting that a charge to the jury that included the "final test" language in favor of a verdict "convey[ed] an evident bias favoring [a verdict]").

### D. *Brown* instruction

■ Later on January 25, the seventh day of deliberations, a juror who was not the foreman sent the seventh note, a lengthy, four-and-a-half-page missive to the court complaining of one juror's "serious obstructionistic [sic] conduct." The writer was careful not to identify the juror or that juror's gender, but indicated that the juror in question was, *inter alia,* unwilling to "follow [the court's] instructions," had "concocted numerous conspiracy theories," and had "refuse[d] to answer [other jurors'] important, relevant questions with responsive replies." The note stated that these conspiracy theories implicated the judge, counsel for both sides, detectives, witnesses, and other jury members; the note also described the "obstructionist" juror as alleging that the lesser included offenses were included on the verdict form so that the jury "would feel 'forced' to convict the defendant of 'something,'" that the evidence had been "'tampered with' to make the defendant 'look guilty,'" and that other jurors had "an 'agenda.'"

The writer of the seventh note also emphasized that "the other eleven of us take our responsibility and oath very seriously and have been working diligently to arrive at the truth," but that these eleven jurors had not "reached consensus on all of the charges." The note-writer stated that the "obstructionist" juror was "thwarting [the other eleven jurors'] efforts to rationally and effectively iron out [their remaining] differences," and ended by "begging [the judge] to intervene in the situation to possibly help solve a problem which [he or she] believe[d] the jury alone [could not] solve."

After a discussion with both parties and Jones's renewed request for a mistrial, the court decided to give the jury an instruction based on a jury charge given by the trial court in *Brown v. United States,* a case in which a trial court was confronted with one juror's "unwilling[ness] to participate in the deliberation process." 818 A.2d 179, 182–84 (D.C.2003). In Jones's case, the trial court stated, *"Brown* seems to support the proposition that, initially one acceptable approach is to remind the jury of their obligation to talk to one another and not argue, to listen to one another and ... that it is appropriate that I can at least suggest that if there's any juror who believes for any reasons that that juror is unable to follow any of the legal instructions that that juror should send a note and advise me, being careful not to advise me of their position on any of the evidence."

Thereafter, the judge, borrowing language from *Brown,* reminded the jurors that "[o]ur system of justice depends on the willingness of each juror to follow the law so that each person is treated equally in accordance with the laws that have been adopted in our community. It is your responsibility as jurors to judge this case based only on the evidence and the testimony presented in the courtroom. It is your obligation not just to argue and talk at one another, but to talk to one another and to listen to what is said. That means you must approach your responsibilities with an open mind and not a closed mind." The court emphasized, "each of you must

decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. You should not surrender your honest convictions about the weight or the effect of the evidence solely because of the opinion of your fellow jurors or merely to reach a verdict. However, you are bound by the oath that you have taken to follow the court's instructions."

Jones argues that the trial court erred when it "refus[ed] to conclude that the jury was deadlocked" after the note on the seventh day about the "obstructionist" juror. Jones asserts that by responding to that note with the instruction modeled on *Brown*, the trial court was effectively giving the jury a second anti-deadlock instruction—an action that we have said is impermissible because doing so "risks affecting adversely the integrity of a verdict." *See Epperson*, 495 A.2d at 1176.

We disagree with Jones. The trial court did not abuse its discretion by "refusing to conclude that the jury was deadlocked" after the individual juror sent a note indicating that there was an "obstructionist" juror on the panel, and did not coerce the jurors into coming to a verdict by "giving at least two anti-deadlock instructions." The *Brown* instruction as given in this case was not an anti-deadlock instruction; it was instead focused on reminding the jurors to perform their duties to apply the law to the evidence presented to them. "What the judge did was to remind the jurors to abide by the oath that they had sworn at the beginning of the trial," and "[t]elling jurors to do what they have already sworn to do is not coercion." *Ford v. United States*, 759 A.2d 643, 648 (D.C.2000). "[A] trial judge should most certainly try to prod a verdict from a 'hung jury,' but should do so with a certain moderation to avoid going over the boundary into coercion." *Epperson*, 495 A.2d at 1176. The judge in Jones's case did not cross that boundary by reminding the jurors of their responsibility to "follow the law" and to "talk to one another."

### E. The verdict

On January 26, the court received the eighth[8] and ninth notes simultaneously.

8. The eighth note concerned a juror's using her cell phone to take photographs of box cutters during an overnight recess in deliberations. Jones has waived consideration of the irregularities in the trial court's handling of this note by failing to raise the issue in his brief, except to mention that the event occurred. *See Braxton v. United States*, 852 A.2d 941, 949 n. 10 (D.C.2004) (citing *In re Shearin*, 764 A.2d 774, 778 (D.C.2000)) ("A claim not argued in the appellant's brief is waived."). In the eighth note, the same juror who composed the fifth note wrote, "You have instructed us not to engage in any investigation into the facts of the case. One jury member has taken photos of four different types of box cutters and tried to enter them into our deliberations. Does this constitute investigation?" The trial judge brought the jury into the courtroom and firmly instructed them not to consider the photographs "or attempt to enter them into [the] deliberations. Do not, do not in any way base your decision on this case on what you may or may not have seen with respect to those pictures. If there is anyone who saw those pictures who believes somehow they are affected by what they saw in terms of their deliberations in this case, then let me know and I'll address ... that issue later." After the jury returned its verdict, the judge questioned the foreman, stating that "the record at least would benefit" from more information on the circumstances surrounding the box cutter photos. The foreman stated that one juror had taken photos of box cutters on her mobile phone but when she showed the photos to the foreman, he told her, "we don't need that. That is not evidence." The foreman testified that he and the photographer were the only jurors to see the photos.

"When jurors are exposed to 'extra judicial information,' the trial court must address whether the jury's deliberations have been tainted by evidence not presented during the course of the trial" through, at minimum, "a

In the ninth note, the same juror who complained about the "obstructionist" juror renewed his objection to that juror, stating that the "obstructionist" juror "continues asserting unsubstantiated conspiracy theories as his/her basis for his/her decisions regarding the charges.... We are no longer deliberating." After consulting the parties, the court brought in the foreman of the jury and asked him, "[d]o you have that same opinion [as the note-writer] that there is one juror on the jury who is not participating in the deliberations?" The foreman responded, "Well, at this point that person is participating, but that person ... has their [sic] views and the views are a little different from everybody else's." The judge then asked if the juror at issue had the view that the judge was involved in a conspiracy to make the case "come out a certain way," to which the foreman replied, "No, no, no, no, sir, no. That person just has their [sic] own convictions and that's it." The court then asked the foreman to return to the jury room.

The judge told the parties that he was going to "ask[ ] the jury to tell [him] if they're deadlocked." He then addressed the jury by saying, "[a]t a time that you deem appropriate, if you would advise me if there is any reasonable likelihood with continued deliberations you can reach unanimous agreement on any charge or all charges or that it's unlikely that you can reach agreement on any charge, at a time that you deem appropriate, you may advise me this afternoon or you may advise me at

any other time." He told the jury that they could go home early if they wanted to and, because it was Friday, resume their deliberations on the following Monday. About an hour later, the jury wrote the tenth note asking to leave early. The court received the jury's eleventh note the following Monday at 10:35 a.m., advising that the jury had reached a verdict. In open court, the jury announced that it found Jones not guilty of AWIKWA and ADW, but guilty of simple assault, PPW, and obstruction of justice.

■ ■ ■ We hold that the jury's verdict was not a product of coercion. "We evaluate jury coercion in light of all the circumstances of the case and from the perspective of the jurors. While a trial judge has a right to order a jury to deliberate further after learning that a jury is having difficulty reaching a unanimous verdict, our role is to determine whether that decision was inherently coercive." *Downing v. United States*, 929 A.2d 848, 860 (D.C. 2007) (internal citations omitted). To determine whether a verdict has been coerced, we must evaluate whether the situation before the court had inherent coercive potential and if the trial judge's actions "exacerbated, alleviated, or were neutral with respect to coercing a potential verdict." *Id.*

Here, the trial court took pains not to put pressure on any particular juror or jurors. Although the trial court read aloud parts of the lengthy note complaining about an "obstructionist" juror, he did nothing to isolate that juror, and in fact his

hearing with counsel present, [to] allow the parties to contribute to the questioning of the affected jurors." *Ransom v. United States*, 932 A.2d 510, 515–16 (D.C.2007). For reasons not explained on the record before us, however, the trial judge failed to conduct such a hearing in this case. Candidly, we find it surprising that the trial judge simply asked the foreman about the circumstances of the photographs, *after* the jury returned its

verdict, instead of conducting an inquiry of the individual jurors as soon as the incident was brought to his attention. We do not know what the judge intended to accomplish by conducting the inquiry after the case was over, and appellant's waiver of the issue makes it unnecessary for us to speculate. We therefore simply remind trial courts of the need to make immediate inquiry whenever an incident of this nature occurs during a trial.

instructions to the entire jury after reading excerpts from the note urged them to be inclusive and to talk with one another more openly: "It is your obligation not just to argue and to talk at one another, but to talk to one another and to listen to what is said." *See Harris,* 622 A.2d at 706–07 (holding that the trial court's allowing deliberations to continue was "judicious" because it minimized the isolation and "localized pressure" placed on a dissenting juror when the last juror in the jury poll revealed that she did not agree with part of the verdict and was sent back to deliberate with the entire jury); *Downing,* 929 A.2d at 859–61 (concluding that the trial court's instruction to continue deliberating "did not exacerbate any inherent coercive potential" where the jury sent a note signed by all but one juror stating that "one juror refused to apply the law," and had caused the jury to be hung).

Further, the trial court offered the jury multiple opportunities to declare itself deadlocked after giving the *Winters/Gallagher* instruction. The jury availed itself of none of these. Additionally, the continued deliberations after the *Brown* instruction "strong[ly] indicat[e] that the jurors did not surrender their will." *Coleman v. United States,* 515 A.2d 439, 453 (D.C. 1986). We recognize that the jury deliberations in this case were not easy, and that the jury requested or required the judge's intervention and instruction at several points in the process. But as we have discussed, we think that even if the jury's notes to the court had the potential to invite coercion or impermissible influence by the court, the trial judge acted within his discretion to instruct the jury in ways that avoided coercing the verdict. "[I]n light of all the circumstances in the case," *Downing,* 929 A.2d at 860, we can "say with assurance that the jury freely and fairly arrived at a unanimous verdict." *Harris,* 622 A.2d at 701 (quoting *(Charles) Smith v. United States,* 542 A.2d 823, 827 (D.C.1988)).

## V. Conclusion

Accordingly, the trial court's judgment is

*Affirmed.*